This case has a lot of issues. It's a case that stems from a conspiracy case and also a possession of unauthorized access devices, a case involving aggravated theft identity, and the first issue I'd like to address today would be the Agneso case. And this deals with the usability of unauthorized access devices and that they must be capable of obtaining something new. We're arguing, Your Honors, that the Agneso case should apply to also the possession case, not only the intended loss, the sentencing case where it had originally applied. With this Court, in defining the statute under unauthorized access devices, stated in following the statute, again, that they must be usable and capable of obtaining something of value. And because of that, the Court gave some examples that we believe should apply not only in sentencing but in the conviction. But didn't the — wasn't there evidence that these cards had balances of at least $5 or more, suggesting that they were clearly usable? Well, Your Honor, let's look at the particular ones. Let me start with AccountNow. AccountNow is the credit card software. This is the software. It's an algorithm software where you have a seed set, one credit card, and then you take this software and you apply the algorithm and then you get out a series of numbers. All that they found with regard to that is that it was in his possession of these — of this printout from the software that they found on his computer. Mr. Raskin testified at trial. He testified that he did not have the full records. He estimated that there were 300, but he didn't know how many — how many card numbers were actually used because it's really fictitious from the standpoint, you know, these numbers are provided from the software, but they are valid at some point because of the software allows it. But he didn't know how many cards were used. He didn't know if the card numbers had expired or if they were canceled. He didn't know if the card numbers were usable at the time of Master's arrest. There wasn't any evidence that Master's used these numbers. So the government also points that maybe you could address the Whitaker Bank cards where they emailed a list of numbers to his colleague Newsom, and the government says there were at least 50 card numbers where there was a cash balance. Are those likewise problematic? Yes. We're arguing that Whitaker is also problematic, Your Honor. I believe that the account now is our best argument. I'll just be honest with you on that because he didn't know the balances and he was not at sentencing. It was clearly an estimate. There was no ability to cross-examine Mr. Raskin on those issues at sentencing. But didn't under 1029, don't they just have to find 15 or am I misunderstanding you? They don't have to find 15 or more. That's correct. But he couldn't. It was merely a shot in the dark. Even if account now is incorrect, what about Whitaker Bank? Does that? Whitaker Bank, Your Honor, they brought in a witness, Melissa Spiller. She gave evidence to Mr. Chu, who was the prosecutor at the time of trial. She had actual evidence that she had given to him, but he never introduced it into evidence. He never provided evidence to the jury of specific customers that were defrauded. Ms. Spiller said that customers had complained generally about their accounts being zeroed out, but there was no evidence presented at trial that Mr. Masters actually tried to use these. And in fact, they got this information from a company called Metavante. And at sentencing, when we asked how they got this information, they said Metavante provided it to us, but they purged the records. They couldn't produce them. I couldn't cross-examine her at sentencing. So aren't we, for our standard of review, aren't we taking all the evidence in the light most favorable to the prosecutor and whether any reasonable juror could find that there were 15 or more devices? That's true, Your Honor. So you're raising factual issues that the jury apparently found against you, and we would have to say no reasonable juror could have determined, based on that evidence, that there were 15 or more usable cards. That's correct. And I submit on the account now, a reasonable jury could not do that. That was just a list of numbers without any idea whether they were valid or not, just a shot in the dark, pure estimate. With regard to Whitaker Bank, they relied on e-mails, as you mentioned, but there was no evidence in those exhibits 47 through 50 that those card numbers were used because they didn't introduce it at trial. They did at sentencing. Is there a requirement under 1029 of showing that they were actually used? Isn't it just that they were capable of use? Isn't that what Oienzo says? It's just that they were capable of being of obtaining something of value. That's correct. But if you look at the examples in the Oienzo case, it's what the Ninth Circuit said, is that there's no proof of usability, and they gave three examples. But you were arguing that there was no evidence that they were actually used, but we don't – but that's not a necessary element. Is that correct? Well, usability, that's true. I'm arguing both. But usability is that they've got to have – if you don't know the expiration date or if you don't know if it's been maxed out or if you don't know if it's been, as I said, canceled, you don't know if they're usable. And on the Account Now documents, there was no evidence whatsoever whether they were expired or canceled or if they were valid. And with regard to the Whitaker Bank issue, it was similar to that. But the Oienzo case says, you know, there's got to be some crossover between the defendant's victim and list of expired numbers, if you're working on that. There's no showing that defendants took steps or attempted to use the expired numbers. There's no showing that defendant possessed the numbers before their expiration. So those are all factors that the Court needs to look at in determining whether or not they're usable, potentially usable. For example, we are also arguing that there isn't – there's insufficient evidence to establish the loss with regard to these others. For example, in the Aruba case. I'm not – I'm not talking about Yeso anymore, but I'm just talking about insufficient evidence to establish loss at trial. This is a – these were some documents that was found in Mr. Masters' car. Agent Bower did say there were 193 valid cards on those documents, but there was no intended use by Mr. Masters. There was no fraudulent purchase for any of those cards. But don't the – I thought the sentencing guidelines said that you should attribute $500 per access device. That's true. If the access device is usable, you should attribute that to 500. So the FBI testified that they were active, and so per se rule is $500 per device. What's wrong with that? Well, Your Honor, there's no intended use by Mr. Masters. As far as we're arguing that was insufficient to establish, you know, his intended use, it was just found in his car, and there were no evidence that how it got in his car, how it came from the Aruba Hotel in Las Vegas, and it just wasn't sufficient. I'd like to turn quickly to Best Buy and American Express just to tie up that there wasn't enough evidence to establish the loss. Angela Cross for Best Buy stated she created a spreadsheet. She found a larger group of unindicted persons. She attributed some of this activity to Masters even while he was incarcerated for about a year. She got this information on Facebook and e-mail addresses and IP addresses, and we established the loss. Along with American Express, which was not charged but relevant conduct, Christy Hawley testified that these were transactions by others. She looked at five e-mails and tracked IP addresses, but again, no Masters' info on the fraud transactions and no evidence that he used or redeemed or possessed these card numbers, him personally. I want to turn with the time I have to talk about no business. Mr. Masters was not in the business of receiving and selling stolen property. There's no evidence that was presented that Mr. Masters actually received property and then sold it. As you know, in the Kimbrough case, a thief who sells goods himself has stolen, is not in the business of receiving and selling stolen property. The property that Mr. Masters received were the card numbers, the fraudulent card numbers, but he did not sell those card numbers. Those card numbers must be sold for him to receive and sell stolen property. The government argues, well, he bought, he purchased computers or merchandise and then sold that. But that was stuff he stole and then sold. But it's the cards himself was what he received, and that, and those card numbers himself, excuse me, were not sold. In other words, he was, your argument is he was not a fence in the typical understanding of that. He was not a fence. That's correct. He was found buying and selling merchandise and selling it that he stole himself, but he never bought and sold the card numbers. With regard to his sentence on that it was unreasonable and failure to award a downward departure, I just want to cover three issues real quick and then reserve a few minutes. One was his mental health, Asperger's syndrome that he has, mind blindness, as it's called. Didn't the court take that into account? She didn't make a finding of taking it into account. What she did is, the only thing that she did was on the Whitaker Bank she applied $122,715 versus $454,000. She lowered the access devices. But she never made a finding that I can recall on his mental health issue for a downward departure. She never found a downward departure. And then another one, and we've briefed it, is that the loss enhancement overstates the seriousness of the offense charged. The restitution amount is $191,000. His actual loss is even less, but the intended loss is over $900,000. And then sentence disparity. There were similarly situated defendants with lesser sentences. There's two cases here. One was a U.S. versus Newsom case, and then there's this case where both Masters and Newsom were indicted. The Newsom case is similar to this scheme, but he was indicted in that. But Dean and Goodwin got probation. Fellman got 10 months. Arena got 18 months. Otterstein and Homnick got 30 months. Did they take plea agreements, or was it? They did plea agreements. They did. And then Newsom, who we briefed that he hadn't been sentenced at the time, and the government also said that he hadn't been sentenced because he had health problems. He got time served. But then he did plea. My client is the only one who did actually go to trial. But there still is a sentence disparity between time served and 30 months and 109 months, and we asked the Court to consider that. And finally, Your Honor, I've got three minutes, but let me just talk about sophisticated means. This is not an especially complex or intricate offense. It's an ordinary credit gift card fraud. Possessed card numbers that not had been issued to him, you know, purchased it. So the government points to the use of Credit Master or the algorithm? And we're using that to argue that it's not sophisticated, because Agent Bauer himself testified that that software is, quote, fairly simple arithmetic. It's not a closely guarded secret or anything, he said. It's freely available on the Internet. And so I submit that this is not a sophisticated means case, and I reserve remaining time if that's okay. You may do so, Counsel. Absolutely. We'll hear from the government. May it please the Court. William Glasser for the United States. The evidence in this case was sufficient to support the jury's finding that not only that the credit and gift cards possessed were usable, but also that more than 15 of those devices, that Masters possessed more than 15 of those access devices. Just to clarify exactly what the evidence showed with respect first to the account now numbers, it is correct that at trial, Mr. Raskin testified that he did not know exactly how many of those numbers might have been expired or canceled. When it came time for sentencing for purposes of the loss determination, Mr. Raskin had informed the case agent that he approximated about 300 of them were still valid. Now, obviously, the Court can't consider that for purposes of the sufficiency of the evidence. But when it comes to the sufficiency of the evidence, Mr. Raskin did testify that he had looked at a list of all approximately 1,960 of those numbers, and that all of those numbers had been issued to specific individuals. He checked that list to make sure that none of those individuals were Mr. Masters. And on cross-examination, he said he did not know how many of those numbers might have been canceled or expired. However, on the deferential review that is owed to the jury's verdict, this Court can find that a reasonable jury could conclude that at least 15 of those 960 numbers remained valid and usable at the time that Mr. Masters possessed them. Now, with respect to the Whitaker Bank numbers, there was more evidence with respect to those numbers that not only that they had actually been used, but that they were usable. Now, it is true, again, that at trial, the numbers that were used, the fraud that the representative testified to was not specifically linked to Mr. Masters. That was done at sentencing. At trial, though, the representative did testify that there had been fraud involved and, in fact, that Whitaker Bank had to shut down its gift card program because there had been so much fraud. But also, there was an e-mail that showed that at least 50 of those numbers actually had positive balances above $5. Furthermore, the testimony at trial was that those gift cards issued by Whitaker Bank did not have expiration dates. And the definition of an unauthorized access device is also a device that can be used to initiate a funds transfer. Those devices could have been obtained even if they had zero balances. The possession of those devices would allow someone to put money back on those to transfer money to another account. So the evidence was sufficient to show usability and satisfies the Onyesso standard with respect to both Whitaker and the Account Now cards. The defendant has also challenged on appeal the proof of his intent to defraud and the evidence with respect to the conspiracy. He did not preserve those claims as part of his Rule 29 motion. And if I may just briefly correct an error that is in my brief that I just want to be clear on the standard of review. In my brief, I say on page 16 in the middle of the second paragraph that he did not move for judgment of acquittal on counts 1, 2, or 3. He actually did, but only with respect to usability. So I just apologize for that error. I wanted to correct that. But that was only with respect to usability. Intent to defraud and the proof of the conspiracy he did not challenge in the district court. And as detailed in the brief, the evidence was sufficient to prove his intent to defraud. There was extensive evidence of a complex scheme involving the obtaining of credit cards and using them to make fraudulent Best Buy purchases. Moving now to the issue of the loss attributable to Mr. Masters. It is true that the Best Buy representative initially included losses that were incurred while Mr. Masters was incarcerated in Florida and also that she linked those 1,113 Best Buy orders to him by looking at evidence such as his Facebook friends. However, at the second day of the sentencing hearing, the FBI agent, Agent Bauer, produced an additional spreadsheet that I filed as a supplemental excerpt of record for this court to review that deducted the transactions that were made while he was in prison in Florida and also made sure that all of the transactions were actually linked back to e-mails that were found in a search of his e-mail account. Those revised numbers that the FBI agent provided showed 1,103 purchases, all of which could be tied specifically to names, IP addresses, e-mails that were found in Mr. Masters' account. And that revised number, still the more conservative estimate, was $419,000. That is sufficient to satisfy the 14-level enhancement under 2B1.1. And so this court need not even address the other losses, which it's our position were adequately proved, if this court were to find that the Best Buy loss was adequately established. And just to remind the court, this is here under a clear error standard. The court would have to find that the district court clearly erred in calculating the loss attributable to Mr. Masters, and the evidence was more than sufficient to establish those numbers. Finally, turning to the reasonableness of his sentence, the district court, it's a little confusing in the sentencing, the transcript of the sentencing hearing. The district court did at one point say that a slight variance is appropriate given the history and characteristics of the defendant, and that was in context of the discussion of Asperger's. However, then the court actually did not impose a variant sentence, but imposed a sentence somewhere in the middle of the guideline range, 109 months, the guideline range was 97 to 121. So it's not exactly clear what the district court meant by that, but the district court did make clear that it did not conclude that Mr. Masters' Asperger's syndrome relieved him of culpability for the defense. The district court made a specific finding with respect to his culpability, and the district court adequately addressed all of his claims respecting variance. So you're arguing that even though the district court did not make an allowance, the district court did take into consideration the Asperger's point. That is absolutely correct, Your Honor. The district court specifically addressed the Asperger's and said that it did not believe that that was, that that lowered his culpability with respect to the offense. Counsel, I have a problem with the Kimbrough issue receiving the enhancement for receiving stolen property. It's clear this man was not a fence in the typical sense, and I think that particular enhancement is addressed to that kind of activity. What's your response? Your Honor, I could not find authority addressing this exact situation, and I would agree that he's not a fence in the usual sense of receiving property and selling that exact same property. However, what he did here is he received stolen credit card numbers and essentially converted them into another more fungible type of good, actual physical goods such as iPads, that he could then resell. So it would be somewhat akin to the owner of a chop shop receiving a stolen vehicle and then reselling the component parts of that vehicle. But actually what he was doing was, as the opposing counsel says, is obtaining goods using fraud, fraud by fraudulent means. So why weren't the Best Buy goods and other goods things he had stolen himself? Your Honor, those were things that he had stolen, obtained by fraud. However, the analysis under Kimbrough is not whether the things that are sold are things that he stole, but rather whether the word receiving. Kimbrough focused on the word receiving and said that receiving in the context of this guideline does not typically connote someone who steals goods. In other words, it's supposed to be some sort of a more passive or perhaps legal receipt of goods. So if I rob a bank and then use the money I stole to buy something at Best Buy, would that enhancement be appropriate? No, Your Honor. Not if you robbed the bank. But if someone who robbed the bank gave you some money and then I used that money to purchase goods, that would make this enhancement appropriate? Yes, Your Honor. And there are ---- Is there a case that says that? No, Your Honor. There's not a case that says that. However, looking at the application notes to the guideline, it gives four factors that are relevant for determining whether or not the guideline is appropriate. Those factors are the regularity and sophistication of the defendant's activities, the value and size of inventory of stolen property maintained by the defendant, the extent to which the defendant's activities encouraged or facilitated other crimes, and the defendant's past activities involving stolen property. And all four of those factors would point to the application of the enhancement in this case. Specifically, if I may emphasize the third factor, the extent to which the defendant's activities encouraged or facilitated other crimes. Effectively, what the defendant was doing here was providing a market for these fraudulently skimmed credit card numbers that were obtained by people overseas, specifically TuzTuz, as he was referred to, in Pakistan. So the application of the enhancement is appropriate here because it helps discourage those people who provide effectively a market for fraudulently obtained credit cards. Now, the government concedes there's no case exactly on point. This is a matter of first impression. But the factors in the guidelines would indicate the enhancement was appropriate. And this is not a Kimbrough situation where there's a problem on the receiving side of the receiving and selling stolen property. It's because the — it's clear that he did not resell the — pardon me. It's clear that he did not steal the property that he himself received. And that was what Kimbrough's analysis regarded. But those four factors still seem to point to the notion that he would resell the same property that he received. Your Honor, yes. I mean, they could be interpreted that way. However, the government's position is that he doesn't have to resell the exact same property he received if there's some way to convert it into some sort of more fungible type of property. And finally, with respect to the issue that was raised in the reply brief regarding the computer restriction and monitoring condition of supervised release, first of all, the government would invoke the waiver rule that he has waived that by not raising it earlier and only raising it in his reply brief. And second, even if the court were to address the merits, the government's position is that under 3583, this was a narrowly tailored condition. Mr. Masters was involved in a complex computer-based fraud scheme. He was someone who was clearly sophisticated in the use of computers. And he had a 2005 conviction for an unauthorized use of a computer. So this is not someone who is being ‑‑ he's not being restricted in some way that would ‑‑ that was not narrowly tailored to his offense circumstances. If the Court has no further questions. No further questions. Thank you. Thank you, counsel. Mr. Stolberger, you have some reserved time. Yes. Thank you. I just want to go to this fence issue. Mr. Masters is not a fence. The two examples that were recently talked about, the chop shop, this is not a situation where Mr. Masters got a, you know, got a big computer and then chopped it up and sold parts of that computer, a hard drive or whatever. It doesn't fit this situation. The bank example is a great one that Judge Akuta talked about. And that is if someone else robs a bank and gives him money, that's not a fence. And that ‑‑ the guideline factor that he talked about that would facilitate other crimes would apply to that situation. I could rob ‑‑ someone could rob banks all day and give people money to go buy goods, but that is not the situation that the Court talked about in Kimbrough. And that guideline factor would apply equally to the bank example. So I don't believe it would be applicable here. Also, just with regard to Mr. Raskin, there was some testimony with AccountNow. He was not at the sentencing hearing. It was hearsay that came in through Agent Bauer. But I think you really have to focus on the AccountNow issue with the credit card software. It was purely an estimate that Agent Bauer got from him. There was no cross at sentencing about it. They didn't know what the credit card ‑‑ he didn't know if the credit card numbers had expired if they were counseled. It didn't really know if they were usable. And I just think the record needs to be closely looked at with regard to those factors. Unless there's any other questions. No questions. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Ikuta, Teilborg